UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY D. DUNNETT,
             Plaintiff,                 CIVIL ACTION NO. 12-10930

       v.                       DISTRICT JUDGE LAWRENCE P. ZATKOFF

COMMISSIONER OF            MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,
             Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 12, 17)**

Plaintiff Kimberly D. Dunnett challenges the Commissioner of Social Security's ("the Commissioner") final denial of her benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 12, 17). Judge Lawrence P. Zatkoff referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 3).

**I.     RECOMMENDATION**

Because the Administrative Law Judge's ("ALJ") findings are supported by substantial evidence, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, the Commissioner's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

**II.    DISCUSSION**

    *A.     Framework for Disability Determinations*

Under the Social Security Act, (the "Act") Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which

-1-

has lasted or can be expected to last for a continuous period of not less than 12 months. 42

U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. §416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534

(6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the

analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers

to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**B.     Standard of Review**

This Court has jurisdiction to review the Commissioner's final administrative decision

pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited such that the Court

"must affirm the Commissioner's conclusions absent a determination that the Commissioner has

failed to apply the correct legal standard or has made findings of fact unsupported by substantial

evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005)

(internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*,

499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

## III.   REPORT

### A.   *Administrative Proceedings*

Plaintiff applied for supplemental security disability income and disability insurance benefits on August 14, 2009, alleging she became disabled on December 20, 2005 (Tr. 10). Plaintiff subsequently amended her disability onset date to January 1, 2009 (Tr. 254).  After the Commissioner initially denied Plaintiff's application, she appeared with counsel for a hearing before ALJ Ethel Revels, who considered the case *de novo*.  In a written decision, the ALJ found Plaintiff was not disabled (Tr. 10-18).  Plaintiff requested an Appeals Council review (Tr. 167). On January 12, 2012, the ALJ's findings became the Commissioner's final administrative decision when the Appeals Council declined further review (Tr. 1-3).

### B.   *ALJ Findings*

Plaintiff graduated from high school and has past relevant work as a dispatcher and babysitter (Tr. 16, 39).  The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that she had not engaged in substantial gainful activity since December of 2005 (Tr. 12).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: systemic lupus erythematosus ("SLE"),[1] hypertension and obesity (Tr. 13).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 13).

_____

[1]"Systemic lupus erythematosus (SLE) is an autoimmune disease, which means the body's immune system mistakenly attacks healthy tissue.  This leads to long-term (chronic) inflammation."  *See* http://www.nlm.nih.gov/medlineplus/ency/article/000435.htm (last visited June 18, 2013).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform:

> a range of light work . . . reduced by the following limitations and restrictions: moderate limitations in [the] ability to maintain concentration for extended periods because of pain to the extent [Plaintiff] is limited to simple, repetitive tasks (unskilled work); no frequent climbing of stairs; no climbing of scaffolds, ladders or ropes; no stooping, kneeling, crouching, crawling or squatting; no operating in temperature extremes; no use of vibratory tools; relatively clean air environment; [and] no use of hand or foot controls.

(Tr. 13-14).

At step four, the ALJ found that Plaintiff was not disabled, because she could perform her past relevant work as a babysitter (Tr. 16). Alternatively, at step five, the ALJ found Plaintiff was not disabled, because there are a significant number of jobs available in the national economy that Plaintiff could perform such as an assembler and office clerk (Tr. 17).

### C.    *Administrative Record*

#### 1.    **Plaintiff's Hearing Testimony and Statements**

Plaintiff testified that she is unable to work due to lupus, heart problems and hypertension (although her hypertension is controlled with medication unless she is excited or stressed) (Tr. 48, 55). Plaintiff's lupus causes fatigue; pain in her wrists, fingers, knees and ankles; and occasional pain in her shoulders. According to Plaintiff, she takes daily naps for an hour-and-a half to two hours; she also elevates her legs four to five times a day for 15-20 minutes (Tr. 40, 45-46). Plaintiff testified that her ankles and knees swell if she stands for extended periods of time, and her wrists and fingers swell if she opens several juice cups or milk cans (Tr. 40). Plaintiff also described pain in her knees when she stands, squats, or repeatedly changes from a sitting to a standing position; her ankles hurt when she puts pressure on them (Tr. 45).

Plaintiff testified that the sun gives her rashes; in the summer, she stays in the house all day.  She also described trouble breathing due to excitement, stress, and physical activity.  When she sleeps flat on her back, Plaintiff said it feels like she is suffocating (Tr. 46).

Plaintiff estimated that she could stand for 15-25 minutes, sit for 20-25 minutes, walk for 10 minutes, and lift a gallon of milk (Tr. 52).  According to Plaintiff: she has difficulty climbing stairs due to shortness of breath, lightheadedness, and the pain in her knees and ankles (Tr. 54); she cannot change her son's diaper or pick him up out of his crib three or four times a month (Tr. 40); and she has trouble unscrewing a pop bottle cap when her hands are swollen (Tr. 53).

Despite her limitations, Plaintiff testified that she can make waffles or toaster pastries for breakfast, and hot pockets or ravioli for lunch.  She can also go grocery shopping twice a month for basic necessities (Tr. 53-54).  Plaintiff's boyfriend does the majority of the grocery shopping, cleans the house, and dresses and bathes her children (Tr. 54).

### 2.    Relevant Medical Evidence

On August 27, 2003, Plaintiff reported disabling myalgias;[2] morning stiffness; extreme fatigue; difficulty accomplishing her daily routine; and arthralgias[3] in her shoulders, wrists and fingers.  Ali Dagher, M.D., F.A.C.P. found Plaintiff had SLE with rash, arthritis, positive ANA,[4]

---

[2]Myalgia is "pain in a muscle or muscles."  *See Dorlands Illustrated Medical Dictionary*, 1233 (31st Ed. 2007).

[3]Arthralgia is "pain in a joint."  *See Dorlands Illustrated Medical Dictionary*, 152 (31st Ed. 2007).

[4]"An ANA test detects antinuclear antibodies in [the] blood. [The] immune system normally makes antibodies to help . . . fight infection.  In contrast, antinuclear antibodies often attack [the] body's own tissues – specifically targeting each cell's nucleus.  In most cases, a positive ANA test indicates that [the] immune system has launched a misdirected attack on [a person's] own tissue – in other words, an autoimmune reaction.  But some people have positive ANA tests even when they're healthy."  *See* http://www.mayoclinic.com/health/ana-test/MY00787 (last visited June 19, 2013).

decreased complements[5] and leukopenia.[6]  On examination, Dr. Dagher noticed a papular

erythematous rash[7] on Plaintiff's forehead, malar area,[8] behind her ears and proximal arms, and

in the V-shaped area of her upper anterior chest.  In addition, Dr. Dagher found Plaintiff had: (1)

pain in her shoulder joints; (2) decreased shoulder abduction;[9] and (3) synovitis[10] in her wrists

and in the joints of her second and third fingers bilaterally.  Dr. Dagher recommended Plaintiff

take Prednisone 20mg per day.[11] (Tr. 305-306).

On September 10, 2003, Dr. Dagher noticed an improvement in Plaintiff's myalgias,

arthralgias and rash.  Plaintiff also had good range of movement in her joints (although, there

---

[5]"Complement is a blood test that measures the activity of certain proteins in the liquid portion of [the] blood.  The complement system is a group of proteins that move freely through [the] bloodstream.  The proteins work with [the] immune system and play a role in the development of inflammation.  There are nine major complement proteins.  They are labeled C1 through C9."  *See* http://www.nlm.nih.gov/medlineplus/ency/article/003456.htm (last visited June 19, 2013).  Decreased complement activity may be seen in SLE.  *See id.*

[6]"A low white blood cell count, or leukopenia, is a decrease in disease-fighting cells (leukocytes) circulating in [the] blood."  *See* http://www.mayoclinic.com/health/low-white-blood-cell-count/MY00162 (last visited June 19, 2013).

[7]"Erythematous papules refer to the redness area infected with papules or red papules on the skin."  Reasons for their occurrence include skin infection, solar radiation, waxing and plucking hairs, or any other skin injury.  *See* http://acne.webbina.com/what-are-erythematous-papules-rashes/ (last visited June 19, 2013).

[8]Malar means "of or relating to the zygomatic bone or the cheek."  *See* http://www.thefreedictionary.com/malar (last visited June 19, 2013).

[9]Shoulder abduction is a lateral movement away from the midline of the body.  *See* http://www.exrx.net/Articulations/Shoulder.html (last visited June 19, 2013).

[10]Synovitis is "inflammation of a synovium; it is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within a synovial sac."  *See* *Dorlands Illustrated Medical Dictionary*, 1879 (31st Ed. 2007).

[11]"Prednisone is used in the management of inflammatory conditions or diseases in which the immune system plays an important role."  *See* http://www.medicinenet.com/prednisone/article.htm (last visited June 21, 2013).

was some tenderness); and, she did not have leg edema[12] or chest pain.  But, Plaintiff still had

morning stiffness.  Dr. Dagher found Plaintiff had SLE with polyarthritis, rash, positive ANA,

low complements and leukopenia.  He recommended that Plaintiff avoid exposure to the sun and

take Plaquenil 200 mg[13] (Tr. 304).

Approximately one month later, Dr. Dagher noted that: (1)  Plaintiff's joint pain

decreased (although, she still had pain, tenderness, and stiffness in her left wrist); (2) Plaintiff

had excellent range of movement in her joints without synovitis; and (3) Plaintiff's rash

continued to improve.  She started complaining of headaches, but denied dyspnea.[14]  Dr. Dagher

found that Plaintiff's SLE and polyarthritis were improving (Tr. 301).

On October 30, 2003, Plaintiff still had SLE with rash and polyarthritis, but her fatigue

and joint pain improved (although, she still had stiffness in the morning), and she had full range

of movement in her joints without synovitis.  Plaintiff denied chest pain (Tr. 300).

On December 10, 2003, Dr. Dagher found Plaintiff still had SLE; and, Plaintiff reported

that her arthralgias increased in her left ankle, knees and shoulder.  But, Plaintiff had full range

of movement in her joints without synovitis and swelling; and, no rash or leg edema (Tr. 297).

---

[12]Edema is "the presence of abnormally large amounts of fluid in the intercellular tissue
spaces of the body, usually referring to subcutaneous tissues.  It may be localized (such as from
venous obstruction, lymphatic obstruction, or increased vascular permeability) or systemic (such
as from heart failure or renal disease)."  *See Dorlands Illustrated Medical Dictionary*, 600 (31st
Ed. 2007).

[13]"Plaquenil is prescribed as a disease-modifier, in other words, to decrease pain,
decrease swelling, and prevent joint damage and disability."  *See*
http://arthritis.about.com/od/plaquenil/a/plaquenil.htm (last visited June 21, 2013).

[14]Dyspnea is "breathlessness or shortness of breath; difficult or labored respiration."  *See
Dorlands Illustrated Medical Dictionary*, 589 (31st Ed. 2007).

On March 31, 2004, Dr. Dagher found that Plaintiff's SLE continued to improve.  While Plaintiff reported fatigue, she did not have any unusual arthralgias, rash or chest pain.  Plaintiff also had full range of movement in her joints (with synovitis) and no leg edema (Tr. 294).

On February 23, 2005, Plaintiff continued to deny arthralgias, chest pain and rash.  She also had full range of motion in her joints without synovitis.  Dr. Dagher diagnosed Plaintiff with controlled SLE and recommended that she avoid exposure to the sun (Tr. 291).

On June 15, 2005, Plaintiff reported that she did not have joint pain, synovitis, leg edema, rash or chest pain.  Dr. Dagher indicated that "[Plaintiff] has been in good health."  However, contrary to Dr. Dagher's advice, Plaintiff had prolonged exposure to the sun.  Dr. Dagher reiterated his recommendation to avoid sun exposure and use sunscreen during accidental exposure; he found Plaintiff still had clinically controlled SLE (Tr. 290).

On February 4, 2008, Plaintiff's SLE fared up (Tr. 282).  But – three months later – Plaintiff's SLE was "clinically quiescent"; she did not have any pain or stiffness in her joints, rash, hair loss, chest pain or fatigue (Tr. 282-283).

In 2009, Plaintiff reported intermittent pain (especially in her knees and feet), bilateral wrist swelling, headaches, shoulder pain and morning stiffness.  Dr. Dagher diagnosed Plaintiff with atypical chest pain on September 22, 2009 (Tr. 265, 267, 269-270, 272).

On September 30, 2009, Plaintiff complained of shortness of breath with mild exertion; back and neck pain; leg pain once a week; and bilateral edema in her hands, ankles and feet.  Plaintiff denied chest pain.  Samir A. Dabbous, M.D., F.A.C.C. noted that Plaintiff's medications included Imuran[15] (Tr. 316-317).

---

[15]"Azathioprine (*Imuran*) is a drug used to treat swelling and pain in arthritis.  The most common diseases treated with umuran are dermatomyositis, [SLE] and vasculitis.  It belongs to a class of medications called disease-modifying antirheumatic drugs (DMARDs) or immunosuppressants.  This class of medicines can decrease joint damage and disability."  *See*

On November 11, 2009, Plaintiff denied chest pain, weight gain or loss, shortness of breath, dizziness, and edema.  Dr. Dabbous found Plaintiff had uncontrolled hypertension (Tr. 373-374).

On December 18, 2009, Plaintiff reported joint pain (especially in her ankles and knees), occasional swelling in her ankles and knees, occasional shortness of breath (especially with exertion), occasional headaches, heartburn, mild nausea, fatigue, arthralgia, myalgia, hair loss, swelling and morning stiffness in her hands once every two weeks, and orthopnea.[16]  S. Obri, M.D. performed an internal medicine examination and diagnosed Plaintiff with SLE, acid reflux disease, shortness of breath with moderate pulmonary hypertension,[17] and mild cardiomyopathy[18] (Tr. 324-325).

Julianne Powers – a medical consultant for the Social Security Administration ("SSA") – completed a physical RFC on January 12, 2010.  She determined Plaintiff could: (1) occasionally

---

http://www.rheumatology.org/Practice/Clinical/Patients/Medications/Azathioprine_(Imuran)/ (last visited June 21, 2013).

[16]Orthopnea is "dyspnea that is relieved by assuming an upright position."  *See Dorlands Illustrated Medical Dictionary*, 1359 (31st Ed. 2007).

[17]"Pulmonary hypertension is a type of high blood pressure that affects the arteries in the lungs and the right side of [the] heart.  Pulmonary hypertension begins when tiny arteries in [the] lungs, called pulmonary arteries, and capillaries become narrowed, blocked or destroyed.  This makes it harder for blood to flow through [the] lungs, and raises pressure within [the] lungs' arteries.  As the pressure builds, [the] heart's lower right chamber (right ventricle) must work harder to pump blood through [the] lungs, eventually causing [the] heart muscle to weaken and eventually fail.  Pulmonary hypertension is a serious illness that becomes progressively worse and is sometimes fatal.  Although pulmonary hypertension isn't curable, treatments are available that can help lessen symptoms and improve [the] quality of life."  *See* http://www.mayoclinic.com/health/pulmonary-hypertension/DS00430 (last visited June 20, 2013).

[18]Cardiomyopathy is "a general diagnostic term designating primary noninflammatory disease of the heart muscle, often of obscure or unknown etiology and not the result of ischemic, hypertensive, congenital, valvular, or pericardial disease."  *See Dorlands Illustrated Medical Dictionary*, 299 (31st Ed. 2007).

lift 20 pounds; (2) frequently lift 10 pounds; (3) stand, walk and sit six hours in an eight-hour

workday; (4) occasionally climb ramps, stairs, ladders, ropes and scaffolds; (5) occasionally

crawl; and (6) frequently balance, stoop, kneel and crouch (Tr. 329-330). She also noted that

Plaintiff should avoid concentrated exposure to extreme cold and vibration (Tr. 332). Ms.

Powers found that Plaintiff's medically determinable impairments "could cause [the] alleged

functional limitations. However, [the] level of severity [was] not fully supported. [Plaintiff] has

had joint pain, but currently[, her] lupus seems fairly stable." According to Ms. Powers, Plaintiff

"still retains [the] ability to do light work [with] some restrictions" (Tr. 330).

    In 2010, Plaintiff reported pain in her knees and feet, unusual body aches in her knee and

ankles, occasional numbness in her left upper extremity, chest pain, bumps on her fingers and

dyspnea (Tr. 396-398).

    On May 21, 2010, Plaintiff complained of left chest pain, shortness of breath, leg pain,

and numbness. She denied dizziness and headaches. Plaintiff reported that she could not

breathe when she lies flat. Dr. Dabbous diagnosed Plaintiff with hypertension (Tr. 375-376).

    On May 26, 2010, Plaintiff reported shortness of breath, cough, wheezing, chest pain and

excessive daytime sleepiness. She denied weight loss or gain. Ihab Deebajah, M.D., F.C.C.P.

diagnosed Plaintiff with possible sleep apnea and obesity (Tr. 361-362).

    On June 29, 2010, Plaintiff reported that she had to take naps; and, she had shortness of

breath, fatigue and chest pain. Plaintiff denied weight loss. Dr. Deebajah diagnosed Plaintiff

with pulmonary hypertension (of unknown cause) (Tr. 340-341).

    Plaintiff spent a night in the observation room at Oakwood Hospital on July 13, 2010 (Tr.

338). On July 23, 2010, Plaintiff reported left chest pain, mild dyspnea, shortness of breath with

exertion, dizziness, headaches, nausea, and a tingling/itching sensation in her left arm. Plaintiff

did not have any major weight gain or loss.  Dr. Dabbous diagnosed Plaintiff with pulmonary

hypertension (Tr. 379-380).

Three days later, Plaintiff continued to report chest pain and dyspnea; Dr. Dagher

diagnosed Plaintiff with pulmonary hypertension (Tr. 394-395).

On July 27, 2010, Plaintiff had shortness of breath, chest pain and fatigue; she denied

weight loss.  Dr. Deebajah diagnosed Plaintiff with pulmonary hypertension and obesity (Tr.

338).

In August of 2010, Plaintiff reported that she took naps; and, had severe pain in her left

knee and left ankle, fatigue, shortness of breath, and chest pain.  She denied weight loss (Tr. 336,

395).

On August 11, 2010, Plaintiff denied shortness of breath, chest pain, dyspnea, edema,

dizziness, and weight gain or loss.  Dr. Dabbous found that Plaintiff's pulmonary hypertension

was resolved (Tr. 386-387).

Dr. Dagher completed a SLE questionnaire on November 1, 2010.  He found that

Plaintiff's SLE was stable, but she had positive ANA, leukopenia, joint or muscle pain, joint

swelling and stiffness, low energy, fatigue, and a rash (Tr. 342-344).  According to Dr. Dagher,

stress, fatigue, physical exertion, and sun exposure exacerbated Plaintiff's symptoms (Tr. 344).

Dr. Dagher noted that Plaintiff required very close monitoring, and her symptoms interfered with

her ability to maintain reliable work attendance (Tr. 344-345).

On November 2, 2010, Plaintiff reported shortness of breath and fatigue; she denied

weight loss.  Dr. Deebajah diagnosed Plaintiff with obesity and excessive daytime sleepiness due

to sleep-disoriented breathing (Tr. 346).

On December 23, 2010, Plaintiff reported a cough, stuffy nose, and occasional dyspnea.

Dr. Dagher diagnosed Plaintiff with atypical chest pain (Tr. 393).

Dr. Dagher completed a physical capacities evaluation on January 17, 2011. He found that Plaintiff could: (1) sit for three hours in an eight-hour workday; (2) stand and walk for one hour in an eight-hour workday; (3) occasionally lift up to 10 pounds and carry up to 20 pounds; (4) occasionally bend and reach; and (5) use her hands for repetitive fine manipulation. Plaintiff could not: (1) use her hands for repetitive grasping, pushing, pulling; (2) use her feet for repetitive pushing and pulling of leg controls; and (3) squat, crawl or climb. Finally, Plaintiff was mildly limited in her ability to drive automotive equipment, and moderately limited in her ability to have exposure to dust, fumes and gases (Tr. 389).

### 3. Vocational Expert

A vocational expert ("VE") did not testify at the hearing on January 19, 2011 due to confusion among the ALJs (Tr. 36-37). The ALJ held a supplemental hearing on May 5, 2011 to hear VE testimony.

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education and past work experience. The individual has the following limitations: (1) can only perform simple, repetitive tasks (i.e., unskilled work); (2) can climb stairs less than frequently; (3) can never climb scaffolds, ladders or ropes; (4) cannot stoop, kneel, crouch, crawl or squat; (5) cannot work at extreme temperatures; and (6) cannot use hand or foot controls, or vibratory tools. The individual also needs a relatively clean air environment. The VE testified that such an individual could perform Plaintiff's past relevant work as a babysitter. The individual could also perform work as an assembler and office clerk (Tr. 29-30).

The individual would be precluded from work if she could only sit, stand or walk for five hours out of an eight-hour workday (Tr. 30).

### D. *Plaintiff's Claims of Error*

-13-

### 1. Step Three of the Disability Analysis

#### a. Listing 14.02A - SLE

Plaintiff first argues that the ALJ erred at step three when she found her impairments did not meet or medically equal a listing. Plaintiff says her impairments met or medically equaled listing 14.02A, which requires that she have SLE accompanied by the "[i]nvolvement of two or more organs/body systems, with: [o]ne of the organs/body systems involved to at least a moderate level of severity; and [a]t least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)." 20 C.F.R. pt. 404, subpart P, app. 1, §14.02. "Major organ or body system involvement can include: . . . hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), . . . or immune system disorders (inflammatory arthritis)." *Id.* at §14.00D1.

Dr. Dagher found that Plaintiff's SLE was accompanied by the involvement of at least two organ or body systems: (1) her polyarthritis involved the musculoskeletal system; (2) her leukopenia involved the hematologic system; and (3) her rash involved the skin organ (Tr. 343). But, this Magistrate Judge finds that none of the organ or body systems were involved to a moderate level of severity.

Plaintiff's polyarthritis was not moderately severe for the following reasons: (1) she continuously had good to excellent range of movement in her joints (Tr. 291, 294, 297, 300-301, 304); (2) her joint pain continuously improved (Tr. 282, 290, 300-301); (3) she only had stiffness in the morning (Tr. 269, 300, 304, 324); and (4) her arthralgias continuously improved (Tr. 291, 294, 304).

Dr. Dagher found that Plaintiff's hematologic system was involved due to leukopenia *solely* because her white cell count was 2,900 on August 27, 2003 – when Plaintiff was first

-14-

diagnosed with SLE (Tr. 306). Since that time, Plaintiff's SLE has been described as stable, controlled and "clinically quiescent" (Tr. 283, 290-291, 330). This Magistrate Judge finds Plaintiff's leukopenia was not moderately severe.

Finally, Plaintiff's rash was not moderately severe, because it continuously improved or was non-existent (Tr. 282, 290-291, 294, 297, 301, 304).

The fact that Dr. Dagher indicated that Plaintiff's symptoms would interfere with her ability to maintain reliable work attendance (Tr. 345), and the fact that Plaintiff was prescribed Prednisone, Plaquenil and Imuran does not change the conclusion. Dr. Dagher's opinion was inconsistent with the evidence, including his own treatment notes. And, as stated above, the record shows that Plaintiff's SLE was controlled with the prescribed medications.

Because Plaintiff's impairments do not satisfy the first prong of listing 14.02A, this Magistrate Judge need not discuss the second prong.

Any error in the ALJ's failure to elaborate on her conclusion that Plaintiff's impairments did not meet or medically equal listing 14.02 was harmless. The ALJ's finding that the "medical evidentiary record does not meet the criteria for disability under [listing 14.02]" (Tr. 13) is supported by substantial evidence and should not be disturbed on appeal.

### b.    *Single Decision Maker*

Plaintiff further relies on *Dorrough v. Comm'r of Soc. Sec.*, Case No. 11-12447, 2012 WL 4513621 (E.D. Mich. October 2, 2012), to support her argument that the ALJ improperly relied on a single decision maker and a non-physician to substantiate her opinion that Plaintiff could perform a limited range of light work.

In *Dorrough* – as in this case – the SSA used the single decision maker model, "an experimental program offered by the [SSA] that authorized participating states to allow their disability examiners to make initial disability determinations without obtaining the opinion of a medical consultant." *Dorrough*, 2012 WL 4513621 at *1.  Although "the State agency's initial disability determination was made by a nonphysician who did not seek the views of a medical consultant," the ALJ in *Dorrough* stated at step three that he relied on "the medical opinions of the State agency and the consultative physician" in determining that Plaintiff's impairments did not meet or medically equal the listed impairments.  The court deemed the ALJ's statement erroneous because "the use of the [single decision maker model] meant that there were no such 'medical opinions of the State agency and consultative physician' upon which the ALJ could properly have relied." *Id.*

Here, the ALJ did not indicate that she relied on medical opinions that did not exist.  At step three, the ALJ stated that she "evaluated [Plaintiff's] impairments under listings 4.01 for cardiovascular diseases and 14.02 for [SLE] [, and] *[t]he medical evidentiary record* does not meet the criteria for disability under these impairments or any other impairment listed in Appendix 1" (Tr. 13).[19]  Further, the decision maker is not required to consult with a medical consultant when the alleged impairments are physical in nature. *See* 20 C.F.R. §404.906(b)(2).

The ALJ's findings are supported by substantial evidence and should not be disturbed on appeal.

### 2.    Plaintiff's Credibility

---

[19]In determining Plaintiff's RFC, the ALJ stated that "the medical evidence supports the State agency conclusion that [Plaintiff's] lupus is generally stable" (Tr. 16).  Again, the ALJ did not rely on a medical consultant.

### a.      *Pain, Swelling, and Stiffness*

In making her credibility determination, the ALJ stated:

[Plaintiff] testified that she has pain and swelling four days each week and up to four flare-ups each month of such severity that she requires help from her family to do activities of daily living such as changing her child's diapers.  The records from treating sources do not support [Plaintiff's] testimony about the frequency or severity of these symptoms and the limitations imposed by them.  Medical records dated back to 2003 document very few emergency room visits for treatment of pain.  The[] reports by the treating sources in which the physician noted the presence of any swelling in any joint upon physical examination are few.  Treating source notes dated November 2010 noted the presence of swelling in the left knee joint.  There was also some swelling in the fingers noted in October of 2010.  Examinations in May and August of 2010 revealed no sign of swelling in any extremity.

Inconsistent statements attributed to [Plaintiff] also undermine her credibility.  She testified that she contends with pain, swelling and stiffness about four days each week.  However, she reported to the consulting physician, S. Obri, M.D., that her symptoms were "off and on" or "once every two weeks or so[.]"[20]

(Tr. 15).  Plaintiff argues that "one just needs to review the record . . . to see the plethora of doctors' appointments and findings confirming plaintiffs[sic] ongoing symptoms/medical problems associated with fatigue, joint pain, shortness of breath, chest pain, etc." (Dkt. No. 12 at 23 CM/ECF).

A review of the medical evidence shows that Plaintiff increasingly reported pain and swelling in January of 2009.  But, – as the ALJ found – Plaintiff's *subjective* complaints were not *medically* supported by physicians.  The ALJ cited to evidence in the record that did support Plaintiff's subjective complaints.  And, Plaintiff does not argue that the ALJ failed to consider

---

[20]Plaintiff is correct that she did not quantify the frequency in which she had joint pain; she only reported to Dr. Obri that she had swelling and morning stiffness in her hands "once every two weeks or so," and swelling in her ankles and knees "off and on" (Tr. 324).  However, this does not change the conclusion that Plaintiff's subjective complaints were not medically supported.

-17-

any other medical evidence that supports Plaintiff's subjective complaints. As such, the ALJ's

finding is supported by substantial evidence and should not be disturbed on appeal.

### b.    Activities of Daily Living

The ALJ also stated the following in her credibility determination:

> [Plaintiff's] activities of daily living suggest greater functional capacity than that
> alleged by [Plaintiff]. Reportedly, she lives with her boyfriend and three children
> (See function report). She makes breakfast, takes her oldest child to school and
> picks her up. She cooks dinner. She reported she sometimes has to lie down with
> legs elevated when they swell, and she does an hour of light household chores
> about twice weekly. She handles money of the household. She goes grocery
> shopping for essentials twice weekly. She visits her mother and brother. She
> socializes weekly.

(Tr. 15). Plaintiff argues that the function report she completed in August of 2009 is obsolete;

she claims her functional capacity had deteriorated by January 19, 2011 – the date of the

administrative hearing. Plaintiff's argument lacks merit.

Plaintiff has the burden – through step four of the disability analysis – to prove she is

disabled. *See Preslar*, 14 F.3d at 1110. The SSA instructed Plaintiff and her representative to

provide any new facts and evidence before the hearing. *See e.g.*, Tr. 67:

> [s]ince the ALJ will review all the facts in your case, it is important that you give
> us any new facts as soon as you can.

> The hearing is your chance to tell the ALJ why you disagree with the decision in
> your case. You can give the ALJ new evidence and bring people to testify for
> you. The ALJ also can require people to bring important papers to your hearing
> and give facts about your case.

Tr. 90:

> [i]f there is more evidence you want the ALJ to see, please submit it to us as soon
> as possible. If you need help, please contact us immediately. Evidence you

-18-

cannot submit to us before the hearing may be brought to the hearing, but earlier submission of evidence can often prevent delays in reviewing your client's case.

Tr. 101:

to expedite your hearing request, be sure to send in all available medical and/or non-medical evidence, or have your attorney/representative do so as soon as possible. This additional evidence could make the difference in the Judge deciding your case sooner.

Tr. 106:

[i]t is very important that the evidence in your file is complete and up-to-date. If there is more evidence, such as recent records, reports, or evaluations that you want me to see, please mail or bring that evidence to me as soon as possible. If you cannot submit the evidence to me before the hearing, you may bring it to the hearing. Submitting evidence to me before the hearing can often prevent delays in reviewing your case.

The function reports that the ALJ relied on are easily accessible on the internet.[21] Despite numerous warnings to send updated information, Plaintiff failed to provide an updated report.

Importantly, Plaintiff completed a Disability Report - Appeals after she completed the function report in August of 2009. Plaintiff reported that she does not have "any new physical or mental limitations as a result of [her] illnesses, injuries, or conditions since [she] last completed a disability report" (Tr. 249), and responded as follows to questions regarding information about her activities:

A.    How do your illnesses, injuries, or conditions affect your ability to care for your personal needs?

*About the same.*

---

[21]*See* http://www.ssa.gov/online/ssa-3380.pdf and http://www.ssa.gov/online/ssa-3373.pdf (last visited June 21, 2013).

B.  What changes have occurred in your daily activities since you last completed a disability report?

*About the same*.

(Tr. 251).  The ALJ's finding is supported by substantial evidence and should not be disturbed on appeal.

### 3.  Treating Source Rule

The Sixth Circuit has instructed ALJs on how to assess opinions from treating sources like Dr. Dagher:

> Treating-source opinions must be given "controlling weight" if two conditions are met:  (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2). If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).

> The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion.  *Id.* § 404.1527(c)(2).  These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996).  This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  Here, the ALJ accorded "minimal weight" to Dr. Dagher's opinion:

> As for the opinion evidence, the undersigned gives minimal weight to the medical source statement by Ali Dagher, M.D., [Plaintiff's] rheumatologist.  Dr. Dagher completed a report indicating that [Plaintiff] could carry up to 20 pounds, but

-20-

would have difficulty standing, walking or sitting in any combination for an entire [eight]-hour workday.  Generally, the opinions of treating sources are afforded persuasive weight when they are supported by the record.  However, the undersigned does not find sufficient objective medical evidence in the record to support the opinion of Dr. Dagher.  As noted, there are no references in treating source records of flare-ups of such frequency or severity.  There is no record of frequent hospitalizations, emergency room visits, or even doctor visits that would be consistent with [Plaintiff's] testimony that she suffers severe flare-ups at least four days monthly and flare-ups to a lesser degree four days weekly.  Dr. Dagher acknowledged that [Plaintiff's] condition is more stable.  He monitors her on a monthly basis.  The undersigned does not give controlling weight to the opinion of Dr. Dagher . . . on the basis that it is not supported by the medical evidentiary record.  The objective tests were either negative or showed mild symptoms.  Dr. Dagher's limitations indicating debilitating conditions is[sic] not consistent with the overall evidence.

(Tr. 16).  The ALJ supported her decision for not affording Dr. Dagher's opinion controlling weight: she determined that Dr. Dagher's opinion was inconsistent with the other substantial evidence in case record.  Thus, the ALJ was not required to give Dr. Dagher's opinion controlling weight. But, this does not end the analysis:

when "the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors – namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion."  *Wilson*, 378 F.3d at 544.  Additionally, "a decision denying benefits 'must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Id.* (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (1996)).

*Beardsley v. Comm'r of Soc. Sec.*, No. 12-cv-11167, 2013 WL 1118009 at *3 (E.D. Mich. March 18, 2013).  Here, the ALJ's decision provides good reasons for the weight assigned Dr. Dagher's opinion and discusses what impact the above listed factors had on the assessment.  Specifically, the ALJ considered the fact that Plaintiff had monthly visits with Dr. Dagher, Dr. Dagher is as a rheumatologist, and his opinion was not supported by or consistent with the evidence.  While the

ALJ did not mention two factors – the length of the treatment relationship, and the nature and extent of the treatment relationship – an ALJ need not "explicitly discuss each and every factor to state a 'good reason' for the weight accorded." *Owens v. Comm'r of Soc. Sec.,* No. 1:12-CV-47, 2013 WL 1304470 at *2 (W.D. Mich. March 28, 2013) (citing *Cole v. Astrue,* 661 F.3d 931, 937 (6th Cir. 2011)).

### 4.      VE Testimony

The following exchange occurred between the VE, the ALJ, and Plaintiff's representative during the supplemental hearing on May 5, 2011 in which Plaintiff was not present:

VE:         [I]f I was to really classify what [Plaintiff] did [as a babysitter] I'd just have to ask her some questions.

ALJ:        And what would those questions be?

VE:         Well, those questions would be, what were the ages of the children [Plaintiff] was supervising and what actually she did . . . with them, did she, you know, basically sit there and make sure they stay out of trouble, basically what her duties were and how old the kids were.

ALJ:        Okay.  Ms. Rossiter, I did not get the age of the kids, did you?

[REP]:      I'm looking at my notes, Your Honor, to see what [Plaintiff] said about that.  It was one to two children I wrote down but I don't have the ages.  But if I remember correctly she said that she watched them while they slept at night, . . . she slept with them, that's all she did.

ALJ:        Okay, so this was during the night that she was doing –

[REP]:      [Plaintiff] was there at night with them, so it was just to have someone there with them at night, it wasn't any major care or anything like that.

|        |        |
|--------|--------|
| ALJ:   | Does that help you at all[?] |
| VE:    | Well, yeah, I guess it would be helpful to know the ages because if they're real young then that's a little more responsibility.  But by in large it sounds like it was unskilled. |
| ALJ:   | Okay. |
| VE:    | And [Plaintiff] did of course perform it in the sedentary position because if they were asleep [she] wasn't . . . required to do anything. |

(Tr. 27-28).  At step four, the ALJ concluded "[t]he [babysitter job] was performed by [Plaintiff] at the sedentary, unskilled level.  The vocational expert testified that an individual with [Plaintiff's] vocational profile and residual functional capacity could do her past relevant work as a [babysitter].  Accordingly, [Plaintiff] is able to perform that past relevant work" (Tr. 16).

Plaintiff argues that the ALJ should not have relied on the VE's testimony because the VE misunderstood the nature of Plaintiff's babysitting job.  This argument lacks merit.

The ALJ did not end her analysis at step four – she continued to step five, and found that Plaintiff could perform other work that existed in significant numbers in the national economy.  As such, an error at step four – *if any* – was harmless.  *See Tommasetti v. Astrue*, 533 F.3d 1035, 1042 (9th Cir. 2008) ("[a]lthough the ALJ's step four determination constitutes error, it is harmless error in light of the ALJ's alternative finding at step five").  The VE's understanding of Plaintiff's babysitting job had nothing to do with the other jobs that the VE testified Plaintiff could perform.  And, Plaintiff does not argue that the ALJ's step five analysis was flawed.

## IV.  CONCLUSION

Because the ALJ's findings are supported by substantial evidence, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, the

Commissioner's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *See McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this Magistrate Judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  *See* E.D. Mich. LR 72.1(d)(3), (4).

s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge

Dated:  June 27, 2013

<u>*Certificate of Service*</u>

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, June 27, 2013, by electronic and/or ordinary mail.*

*s/Eddrey Butts*
*Case Manager for Magistrate Judge Randon*